UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE  DIVISION

MICKEY ERVIN,                     )
                                        )
           Plaintiff,           )
                                        )
       vs.                     )         2:04-cv-0205-JDT-WGH
                                        )
JOHNSON & JOHNSON, INC. and   )
CENTOCOR, INC.,               )
                                        )
           Defendants.      )

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Docket No. 39)
AND MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY (Docket No. 43), AND
ON PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY (Docket No. 40)[1]**

       Plaintiff Mickey Ervin brought this product liability suit against the Defendants,

Johnson & Johnson, Inc. ("Johnson & Johnson") and Centocor, Inc. ("Centocor"),

alleging that Remicade, a drug developed by Defendants to treat Crohn's disease,

caused Ervin to develop an arterial blood clot, which led to the amputation of his lower

leg.  The Defendants filed a motion for summary judgment and a corresponding motion

in limine to exclude the testimony of Dr. Lee McKinley, who is the Plaintiff's medical

expert.  The Plaintiff likewise filed a motion to exclude portions of the testimonies of Drs.

Douglas Rex and Barbara Matthews, who are the Defendants' medical experts.  These

motions are now ripe for review, and the court finds as follows:

---

[1]  This Entry is a matter of public record and will be made available on the court's web
site.  However, the discussion contained herein is not sufficiently novel to justify commercial
publication.

## I.    BACKGROUND

In March 2001, Ervin was a twenty-year-old male suffering from Crohn's disease, Type 1 insulin dependent diabetes, and hypothyroidism.  (McKinley Dep. 26:1-11.)  His case of Crohn's was severe, and he required over 200 units of blood transfusions over a period of years prior to March 2001 due to the disease.  (Ghosh Dep. 40:12-41:1; McKinley Dep. 34:20-36:3.)  Ervin received several different medications to treat his Crohn's disease, but none were very effective in treating his disease.

In March 2001, Dr. Maisel, Ervin's gastroenterologist, discussed with Ervin the option of treating his Crohn's with Remicade.  (Maisel Dep. 23:10-13.)  At the time of the discussion, Dr. Maisel was familiar with the possible risks and side effects associated with Remicade, including the information that was listed on the drug's package insert. (*Id.* at 34:9-35:1.)  The package insert stated the following:

> ADVERSE REACTIONS:
> Serious adverse events (all occurred at frequencies <2%) by body system in all patients treated with REMICADE are as follows:
> . . .
> *Vascular (Extracardiac)*: brain infarction, peripheral ischemia, pulmonary embolism, *thrombophlebitis deep*.

(S.J. Br., Ex. 8 (emphasis added).)  "Thrombophlebitis deep" refers to the risk of venous thrombosis, not arterial thrombosis.  Ervin agreed to the treatment and underwent his first infusion of Remicade on March 21, 2001.  Ervin had no problems with the first infusion.  (Maisel Dep. at 28:1-3.)  He underwent a second infusion of Remicade on

April 25, 2001.  During this second infusion, Ervin experienced certain syptoms and the infusion was stopped temporarily so a nurse could treat him with Benadryl.  (*Id.* at 30:15-31:3.)  The symptoms dissipated, and Ervin completed the second infusion and was discharged without complications.  (*Id.* at 31:12-17.)

On April 30, 2001, Ervin complained to his internal medicine doctor, Dr. McKinley, of pain in his hands and legs.  After examining Ervin, Dr. McKinley adjusted his diabetes medication and prescribed a pain medication.  (McKinley Dep. 66:20-67:12.)  After the pain intensified, Ervin was hospitalized the next day, on May 1, 2001.  The doctors diagnosed him with arterial thrombosis (a blood clot located in the artery) of the left leg.  Dr. Morrison, a vascular surgeon, performed a thromboembolectomy on May 1 to clear the clot and restore the blood flow.  Initially, the procedure appeared successful, but on May 4, just prior to his scheduled discharge, Ervin experienced additional arterial thrombosis in his left leg.  Additional attempts to clear the clots failed, and Ervin underwent a left below-the-knee amputation on May 6, 2001.

Lab reports taken during his hospitalization in May 2001 show that Ervin had a Protein S activity level of 61%.  (Mot. Limine Br., Ex.14.)  Protein S is a naturally occurring anticoagulant—a low Protein S level is indicative of a higher tendency to clot. (Morrison Dep. 13:16-20.)  The lab report defined 61% as "Low."  However, Dr. McKinley asserts that a Protein S activity level above 50% is not clinically significant.

In addition to low Protein S activity and Crohn's disease, Ervin also registered an elevated platelet count of 674,000.  While this number is elevated, Dr. McKinley

stated that it is not "into the range that we would actively treat it." (McKinley Dep. 57:24-25.) In addition, Dr. McKinley noted that Ervin had at least a four-year history of elevated platelet counts. (*Id.* at 57:17-20.)

In May 2002, one year after his arterial thrombosis and subsequent amputation, Ervin developed a cerebral vein thrombosis. Ervin had not undergone any Remicade treatments since the previous incident and the cerebral vein thrombosis was completely unrelated to Remicade. (*Id.* at 156:19-25.) In July 2002, one month after the cerebral thrombosis, lab reports indicated that his Protein S level was at 33% (Mot. Limine Br., Ex.15), which, according to Dr. McKinley, was significantly low (McKinley Dep. 84:11-14).

The Food and Drug Administration ("FDA") approved Remicade for use with Crohn's disease in August 1998 and for use with rheumatoid arthritis in November 1999. Centocor submits the Remicade Periodic Safety Update Reports ("PSUR") to the FDA and the European Medicines Agency on a biannual basis. In each report, Centocor provides information on thromboembolic events reported during the relevant six-month period and assesses possible causal associations. The PSURs indicate that, as of August 23, 2003, 492,874 patients had been exposed to Remicade. (PSUR (8), Feb. 2003-Aug. 2003, pg. 1.) Of those 492,874 patients, Centocor had received 356 reports of thromboembolic events (0.072%), which include both arterial and venous events.[2] (PSUR (9), Aug. 2003-Feb. 2004, pg. 152.) There had only been twenty-nine

---

[2] The February 2004 PSUR (9) indicates that there have been a total of 408 reported
(continued...)

reported cases (0.006%) of arterial thrombosis with those patients.  (*Id.*)  These figures demonstrate a 0.006% reported occurrence rate of arterial thrombosis with those patients exposed to Remicade.

Medical studies and case reports have linked vascular complications and thrombosis to patients with Crohn's disease.  One study followed 7199 Crohn's patients over an eleven year period at the Mayo Clinic.  Robert W. Talbot et al., *Vascular Complications of Inflammatory Bowel Disease*, 61 Mayo Clin. Proc. 140 (1986).  Of those 7199 patients, ninety-two developed a thromboembolic condition (1.3%).  *Id.* However, only seven of those ninety-two cases involved arterial thrombosis (0.1%).  *Id.* at 142.  Moreover, six of the seven arterial thrombosis cases involved postoperative patients.  *Id.*  Thus, only one non-postoperative Crohn's patient in the study developed a case of arterial thrombosis (0.014%).  Another study completed in 1936 reports that eighteen of 1500 Crohn's patients (1.2%) developed extensive arterial and venous thrombosis.  *Id.* at 140.  Although the court cannot tell how many of those eighteen reported cases involved arterial thrombosis, it can infer that there was at least one case of arterial thrombosis as part of that study.  Nevertheless, the extremely low occurrence rate of arterial thrombosis in these studies suggests that it is a rare event that occurs in anywhere from 0.014% to 0.1% of Crohn's patients.

---

(...continued)
thromboembolic events.  Because PSUR (9) does not provide a total patient exposure number as of February 2004, the court will use the total patient exposure number of 492,874 that is indicated in the August 2003 PSUR (8).  Thus, the court will subtract the thromboembolic events indicated in PSUR (9) that occurred after PSUR (8).

## II.    STANDARD OF REVIEW

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, affidavits, and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). The court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light most reasonably favorable to the nonmoving party.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Baron v. City of Highland Park*, 195 F.3d 333, 337-38 (7th Cir. 1999).  However, once a properly supported motion for summary judgment is made, the non-movant "cannot rest on the pleadings alone, but must identify specific facts to establish that there is a genuine triable issue."  *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994); *see* Fed. R. Civ. P. 56(e).

## III.    DISCUSSION

### A.    Fact of Causation May be Established by Expert Testimony Only

Ervin brings five counts against the Defendants: 1) Product Liability—Negligence; 2) Product Liability—Failure to Warn; 3) Breach of Warranty of Merchantability;

4) Wantonness; and 5) Fraud, Misrepresentation, and Suppression.  Ervin does not

dispute that each of his claims requires a finding of fact that the Defendants' Remicade

was the legal cause of his arterial thrombosis and subsequent amputation.  "Proximate

cause is an essential element of, and is determined in the same manner in, both

negligence and product liability actions."  *Wolfe v. Stork RMS-Protecon, Inc.*, 683

N.E.2d 264, 268 (Ind. Ct. App. 1997).  Without a proved causal relationship, all causes

of action connecting Ervin's arterial thrombosis to Remicade fail for lack of an essential

element.  Ervin's product liability claims place upon the claimant the burden of proving

that "the defective condition was a proximate cause of the loss complained of."  *Lantis v.

Astec Indus., Inc.*, 648 F.2d 1118, 1120 (7th Cir. 1981) (applying Indiana law); *Ortho

Pharm. Corp. v. Chapman*, 388 N.E.2d 541, 545 (Ind. Ct. App. 1979).  A party claiming

injury bears the burden of proving an injury proximately resulting from the defendant's

acts.  *Harris v. Raymond*, 715 N.E.2d 388, 393 (Ind. 1999); *Cowe by Cowe v. Forum

Group*, 575 N.E.2d 630, 636 (Ind. 1991).  Ervin must prove that the Defendants'

Remicade caused his injury.

Proximate cause requires a showing of causation in fact, which is a showing that

"the injury would not have occurred without the defendant's negligent act or omission."

*City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1243-44 (Ind.

2003); *see also Ortho Pharm.*, 388 N.E.2d at 555 (A legal cause-in-fact is "that cause

which, in natural and continuous sequence, unbroken by any efficient intervening cause,

produced the result complained of and without which the result would not have

occurred.").  "At a minimum, proximate cause requires that the injury would not have

occurred but for the defendant's conduct."  *Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048, 1054 (Ind. 2003); *see also Hamilton v. Ashton*, — N.E.2d —, 2006 WL 1098288, at *5 (Ind. Ct. App. Apr. 27, 2006).  Under Indiana law, the evidentiary standard required to establish the fact of causation in this matter is a preponderance of the evidence, which requires a "more likely than not" showing.  *Watson v. Med. Emergency Serv. Corp.*, 532 N.E.2d 1191 (Ind. Ct. App. 1989).  Ervin must prove by a preponderance of the evidence that his arterial thrombosis would not have occurred but for his Remicade infusion.

"When the issue of proximate cause is not within the understanding of lay persons, testimony of an expert witness on the issue is necessary."  *Watson*, 532 N.E.2d at 1194.  Due to the medical issues involved in this case, the matter presents a situation where expert testimony is not only helpful but absolutely necessary.  Under Indiana law, "questions of medical causation of a particular injury are questions of science necessarily dependent on the testimony of physicians and surgeons learned in such matters."  *Armstrong v. Cerester USA, Inc.*, 775 N.E.2d 360, 366 (Ind. Ct. App. 2002) (quoting *Hannan v. Pest Control Servs., Inc.*, 734 N.E.2d 674, 679 (Ind. Ct. App. 2000)).  Accordingly, the Defendants' motion to exclude Dr. McKinley's expert testimony on causation is a watershed issue.  If Dr. McKinley's expert testimony is inadmissible, then Ervin lacks expert testimony on the issue of medical causation, and summary judgment in favor of the Defendants would be appropriate.

### B.    Expert Testimony of Dr. McKinley

For an expert's testimony to be admissible, it must comport with the requirements of Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  The Seventh Circuit recently reemphasized that "Rule 702 has superseded *Daubert*, but the standard of review that was established for *Daubert* challenges is still appropriate."  *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005).

Rule 702 and *Daubert* require that the court determine whether the expert testimony is both relevant and reliable.  In determining reliability, the court must ascertain whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable.  *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 640 (7th Cir. 2003) (citing *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)).  Thus, the court must undertake a three-step analysis in determining whether expert testimony is admissible under Rule 702.  First, the witness must be qualified "as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  Second, the expert's reasoning or methodology underlying the testimony must be scientifically reliable.  *Daubert*, 509 U.S. at 592-93.  Finally, the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  The court will apply this three-step analysis to the expert testimony of Dr. McKinley.

The Defendants first argue that Dr. McKinley lacks the requisite "knowledge, skill, experience, training, or education" under Rule 702 to qualify as an expert to give testimony on the causal relationship between Remicade and Ervin's arterial thrombosis. The Defendants aver, and Ervin does not dispute, that Dr. McKinley is not an expert in epidemiology or biostatistics.  (McKinley Dep. 50:6-9.)  Likewise, he is not a gastroenterologist and has never prescribed Remicade.  However, Dr. McKinley is a practicing board certified internal medicine and critical care specialist.  He has experience treating patients with Crohn's disease.  (*Id.* 41:6-8.)  As a practicing internist, he often uses the process of differential diagnosis to make diagnostic and therapeutic decisions for patient care.  (McKinley Expert Report 2.)  In addition, he lectures on thrombophilia (McKinley Dep. 136:12-13), which is "a disorder of the hemopoietic system in which there is a tendency to the occurrence of thrombosis."  *Stedman's Medical Dictionary* 1831 (27th ed. 2000).  For the last sixteen years, he has taught medical and doctoral students at the Indiana University campus their initial lectures on clinical coagulation (clotting) disorders.  (McKinley Dep. 136:17-23.)  This experience gives Dr. McKinley the requisite knowledge, training, skill, and education to provide an expert opinion, based upon a differential diagnosis, regarding the cause of Ervin's arterial thrombosis.

Once the expert is deemed qualified, the court must address whether the methodology underlying the expert's conclusion is reliable.  *See Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004).  It is not the court's role to decide whether an expert testimony is correct; instead, the court performs a

gatekeeping function in which it is "limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Smith*, 215 F.3d at 719 (citation omitted).  In determining whether the "reasoning or methodology underlying the testimony is scientifically valid," *Daubert*, 509 U.S. at 592-93, the court must consider "whether the testimony has been subjected to the scientific method, ruling out any subjective belief or unsupported speculation." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (citing *Porter v. Whitehall Labs. Inc.*, 9 F.3d 607, 614 (7th Cir. 1993)).

In this case, Dr. McKinley relies on the process of differential diagnosis to arrive at his opinion, concluding that "to a reasonable degree of medical certainty . . . the use of the Remicade was the major contributing factor to Mr. Ervin's thrombotic arterial occlusion and subsequent below knee amputation."  (McKinley Expert Report 3.) Differential diagnosis, or differential etiology, is a process by which a physician determines the cause of a patient's symptoms by first determining, or "ruling-in," all plausible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely.  This technique "has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 758 (3d Cir. 1994). While the Seventh Circuit has not directly addressed whether a proper differential diagnosis can satisfy Rule 702 and *Daubert*, the majority of the courts of appeals has recognized the technique as valid and reliable.  *See Feliciano-Hill v. Principi*, 439 F.3d

18, 25 (1st Cir. 2006) (finding that differential diagnosis is a reliable technique under *Daubert*); *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1123-1124 (10th Cir. 2004) (finding that differential diagnosis is "a common method of analysis" and is reliable under *Daubert*); *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1058-59 (9th Cir. 2003) (recognizing differential diagnosis as a reliable method); *Mattis v. Carlon Elec. Prods.*, 295 F.3d 856, 861 (8th Cir. 2002) (holding that "[a] medical opinion based upon a proper differential diagnosis is sufficiently reliable to satisfy *Daubert*"); *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 261 (6th Cir. 2001) (recognizing differential diagnosis as an acceptable method of determining causation); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999) (holding that differential diagnosis is a reliable technique "of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated"); *Zuchowicz v. United States*, 140 F.3d 381, 387 (2d Cir. 1998) (upholding district court decision to admit differential diagnosis testimony); *In re Paoli*, 35 F.3d at 758 (same).  *But see Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1295 (11th Cir. 2005) (holding that in the context of summary judgment, differential diagnosis evidence by itself does not suffice for proof of causation).

However, while these courts recognize the methodology of differential diagnosis as scientifically valid, the same courts also warn that opinions based on differential diagnosis must be analyzed on a case-by-case basis, ensuring that the expert's application of the technique is reliable and proper in each case.  As the Eleventh Circuit explained:

> [A]n expert does not establish the reliability of his techniques or the validity of his conclusions simply by claiming that he performed a differential diagnosis on the patient. . . .  "No one doubts the utility of medical histories in general or the process by which doctors rule out some known causes of disease in order to finalize a diagnosis.  But such general rules must . . . be applied fact-specifically in each case."

*McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1253 (11th Cir. 2005) (quoting *Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir. 1999)); *see also In re Paoli*, 35 F.3d at 758 (Differential diagnosis "is a method that involves assessing causation with respect to a particular individual.  As a result, the steps a doctor has to take to make that (differential) diagnosis reliable are likely to vary from case to case.")  Thus, an expert's use of differential diagnosis is reliable and valid only if the expert applied the technique in a manner which is also reliable.  In this case, the court finds two critical flaws in the manner in which Dr. McKinley applied the differential diagnosis.  Due to these flaws, the diagnosis itself is not sufficiently reliable to satisfy *Daubert*.

### 1.    Flaw in Rule-In Aspect of Differential Diagnosis

In a proper differential diagnosis, the physician's first step is to "rule-in" all of the scientifically plausible causes for the patient's symptoms.  This step of the diagnosis includes the general causation aspect of the test.  In other words, in order to rule-in a plausible cause, the expert must first reach the determination that the suspected cause is actually capable of causing the injury.  Expert opinion on the issue of general causation must be derived from a scientifically valid methodology.  In this case, Dr. McKinley rules-in Remicade as a plausible cause for the arterial thrombosis, and, in doing so, finds that Remicade is actually capable of causing the arterial thrombosis.  Dr.

McKinley provides no epidemiological studies linking Remicade to arterial thrombosis and provides no physiological explanation as to how Remicade would cause arterial thrombosis.  Instead, he bases the ruling-in (or general causation) aspect of his opinion on the temporal proximity between the infusion of the drug and the development of the clot, and upon a limited number of case reports, which were reported in the manufacturer's Periodic Safety Update Reports (PSUR) to the FDA, that also demonstrate a temporal proximity.

Courts should treat with caution those expert opinions based on case reports.  As one court explained, "case reports are merely accounts of medical events."  *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1199 (11th Cir. 2002).  A doctor makes a case report when a patient demonstrates adverse symptoms that are temporally connected with the prescribed drug.  The reports contain very basic information, often omitting patient histories, descriptions of the course of treatment, and reasoning to exclude other possible causes.  "Case reports make little attempt to screen out alternative causes for a patient's condition.  They frequently lack analysis.  And they often omit relevant facts about the patient's condition.  Hence, 'causual attribution based on case studies must be regarded with caution.'" *Glastetter v. Novartis Pharms. Corp.*, 252 F.3d 986, 989-90 (8th Cir. 2001) (quoting *Reference Manual on Scientific Evidence* 475 (Federal Judicial Center 2000)); see also *Rider*, 295 F.3d at 1199 (affirming the district court's exclusion of expert testimony based on case reports because "they do not rule out the possibility that the effect manifested in the reported patient's case is simply idiosyncratic or the result of unknown confounding factors"); *Hollander v. Sandoz Pharms. Corp.*, 289 F.3d

1193, 1209-12 (10th Cir. 2002) (same); *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123,

1129 (D.C. Cir. 2001) (same); *Caraker v. Sandoz Pharms. Corp.*, 188 F. Supp. 2d 1026,

1035 (S.D. Ill. 2001) (same); *Lennon v. Norfolk & W. Ry. Co.*, 123 F. Supp. 2d 1143,

1152-53 (N.D. Ind. 2000) (same).  Indeed, Dr. McKinley agrees that a doctor should not

rely merely on case studies to establish a causal relationship.  (McKinley Dep. 129:11-

18, 130:20-23.)  In essence, the case reports do little more than establish a temporal

association between an exposure to a drug and a particular occurrence.  Granted, "an

overwhelming amount of case reports of a temporal proximity between a very specific

drug and a very specific adverse event might be enough to make a general causation

conclusion sufficiently reliable."  *Caraker*, 188 F. Supp. 2d at 1035.  Here, Dr. McKinley

believed he saw "enough" occurrences of arterial thrombosis in these case reports to

justify ruling-in Remicade as a plausible cause of the arterial thrombosis.  (McKinley

Dep. 129:12-23.)

Despite Dr. McKinley's concerns, the case reports show a relatively small

number of occurrences of arterial thrombosis.  As of August 23, 2003, 492,874 patients

had been exposed to Remicade.  (PSUR (8), 2/03-8/03, pg. 1.)  Of those 492,874

patients, there had only been twenty-nine case reports indicating arterial thrombosis

(PSUR (9), 8/03-2/04, pg. 152).[3]  Again, very little is known about these twenty-nine

---

[3]  The February 2004 PSUR (9) actually indicates that there have been a total of 30
reported arterial thrombosis.  However, PSUR (9) does not provide a total patient exposure
number as of February 2004, so the court will use the total patient exposure number of 492,874
that is indicated in the August 2003 PSUR (8).  In doing so, the court will also subtract the
arterial thrombosis events indicated in PSUR (9) that occurred after PSUR (8), which was just
one additional case of arterial thrombosis.

incidents or about possible contributing factors.  Even so, twenty-nine occurrences out of 492,874 patients results in a percentage of 0.006%.  This low figure does not appear to justify ruling in Remicade as a plausible cause.  But even if it does, then Dr. McKinley should have also considered, or ruled-in, Ervin's Crohn's disease as a plausible cause of the arterial thrombosis.

Ervin suffers from a severe case of Crohn's.  Prior to the Remicade treatments, his Crohn's was so severe that Ervin required two to three blood transfusions every two weeks.  (McKinley Dep. 58:4-6.)  Case studies have also shown a temporal relationship between Crohn's disease and arterial thrombosis.  One peer-reviewed article describes a case study of 7199 patients with Crohn's disease at the Mayo Clinic from 1970 to 1980.  Robert W. Talbot et al., *Vascular Complications of Inflammatory Bowel Disease*, 61 Mayo Clin. Proc. 140 (1986).  Of those 7199 patients, seven developed arterial thrombosis, which results in a percentage of 0.1%.  *Id.* at 142.  Dr. McKinley qualifies this number by observing that six of these seven occurrences were with post-operative patients.[4]  Even if the six post-operative occurrences were not considered, then the study still shows that one out of 7199 Crohn's patients (0.014%) in the case study developed an arterial thrombosis.  This is admittedly a low figure, and for that reason, Dr. McKinley will not rule-in Crohn's as a plausible cause in his differential diagnosis.  The court understand's Dr. McKinley's reasoning for not ruling in Crohn's with the case

_____

[4]  The court notes that due to the limited information available in the case reports regarding the twenty-nine occurrences of arterial thrombosis associated with Remicade, the court does not know how many of those twenty-nine patients were also post-operative.  This fact illustrates the problem with relying on case reports in support of a medical opinion.

study demonstrating such a low occurrence.  However, what the court does not

understand and what most concerns the court is that Dr. McKinley has no problem

ruling-in Remicade, with an occurrence rate of 0.006% in the case reports, but refuses

to rule-in Crohn's because its occurrence rate of 0.014% to 0.1% is too low.  The

decision to rule-in Remicade is not only based on unreliable data demonstrating an

insignificant occurrence rate, but it is also inconsistent with his decision not to rule-in

Crohn's.  Thus, the court finds that his application of the differential diagnosis technique

is unreliable and fails the standards set forth in Rule 702 and *Daubert*.[5]

### 2.   Flaw in Rule-Out Aspect of Differential Diagnosis

After properly ruling-in all of the plausible causes of the patient's symptoms, the

physician's next step in the differential diagnosis is to eliminate, or "rule-out," each of

these potential causes until reaching one that cannot be ruled out or determining which

of those that cannot be excluded is the most likely.  This step of the diagnosis includes

the specific causation aspect of the test.  In this case, Dr. McKinley ruled-in multiple

plausible causes (but, as explained above, failed to rule-in Crohn's), including deficient

Protein S levels, viscosity of the blood, elevated platelet count, vasculitis, and

---

[5] In addition, Dr. McKinley appears to call into doubt his own opinion.  When confronted with scientific medical literature associating arterial thrombosis with Crohn's disease and asked how that information would affect his opinion, he admits that in 2001, he did not know of an association between Crohn's and thrombosis, and that now "I am aware there are more cases [associating Crohn's with arterial thrombosis] out there than there were then [in 2001].  I wish I had known those things then.  I didn't. . . .  I would have to reinterpret this case in a completely different way. . . .  I have to look at the way I thought then and I could probably look at the way I could think now."  (McKinley Dep. 98:18-102:19.)  In forming his opinion, Dr. McKinley should consider all evidence, including evidence he has learned since the time of the injury in May 2001.  He does not appear to do so here.

Remicade.  (McKinley Dep. 96:5-25.)  Dr. McKinley was able to rule-out each of these plausible causes, except for Remicade.  Accordingly, he opines that Remicade was the most likely cause of the arterial thrombosis.

Dr. McKinley ruled-out the possibility that a low Protein S activity level could have caused the arterial thrombosis.  Protein S is a naturally occurring anticoagulant—when it is low, the blood has a higher tendency to clot.  Lab reports taken during Ervin's hospitalization in May 2001 show that he had a Protein S activity level of 61%.  (Mot. Limine Br., Ex. 14.)  The lab report defined 61% as "Low."  However, Dr. McKinley asserts that a Protein S activity level above 50% is not clinically significant.  (McKinley Dep. 84:11-14.)  In addition, Dr. McKinley recognized that a deficient Protein S level is "only associated with venous disease," and is not pertinent to arterial disease.  (*Id.* 85:18-23.)  Because his level was not significantly low and because he had suffered an arterial event, Dr. McKinley ruled-out low Protein S as the specific cause of Ervin's arterial thrombosis.

A problem arises in Dr. McKinley's reasoning because, as noted in one medical textbook, "[a]rterial thrombosis seems to occur more frequently in subjects with [Protein S] deficiency than in other thrombophilic states."  Scott H. Goodnight & William E. Hathaway, *Disorders of Hemostasis and Thrombosis* 377-78 (2001).  Upon further questioning, even Dr. McKinley concedes that he is aware of some rare reports associating protein S deficiencies with arterial disease.  (McKinley Dep. 85:23-86:4.)  Furthermore, in May 2002, one year after his arterial thrombosis and subsequent amputation, Ervin developed a cerebral vein thrombosis.  Ervin had not undergone any

Remicade treatments since the previous incident and the cerebral vein thrombosis was completely unrelated to Remicade.  (*Id.* 156:19-25.)  In July 2002, one month after the cerebral thrombosis, lab reports indicated that his Protein S level was at 33% (Mot. Limine Br., Ex.15), which, according to Dr. McKinley, was significantly low (McKinley Dep. 84:11-14).  Despite the fact that the significantly low Protein S level in 2002 could be indicative of some type of thromboembolic potential (*Id.* 105:20-24), Dr. McKinley nevertheless did not include the 2002 level in considering whether a low Protein S level could had played a part in his 2001 arterial thrombosis.  But he concedes that if he were to form an opinion today, including consideration of the 2002 Protein S level, he "would have to add this to the list of possibilities."  (*Id.* 106:8-9.)

Dr. McKinley admits that a significantly low Protein S level has been associated, at least in some cases, with arterial thrombosis.  He further admits that Ervin's significantly low Protein S level in 2002 could be indicative of a hypercoagulability syndrome (*Id.* 107:2-4), which should also be added to the list of plausible causes.  He provides no reason to rule-out this plausible cause (at least not with the 2002 Protein S levels).  Accordingly, Dr. McKinley's differential diagnosis fails to demonstrate how Remicade is a more likely cause than a low Protein S level.

The flaws in Dr. McKinley's differential diagnosis, as explained above, leave his diagnosis unreliable under the standards set forth in Rule 702 and *Daubert*.[6]  As such,

_____

[6] These same considerations would have also precluded Dr. McKinley's opinion at the third step of the Rule 702 analysis in that his inadequate analysis would not have aided the jury in understanding the causation question or in determining whether Remicade was the cause of

(continued...)

the court will GRANT the Defendants motion in limine and exclude the expert testimony of Dr. McKinley.  Ervin has no other expert testimony on the issue of medical causation and each of his counts against the Defendants will fail for lack of satisfying the requisite causation element.  Accordingly, the Defendants are entitled to summary judgment on all counts.

## IV.     CONCLUSION

For the foregoing reasons, the court **GRANTS** the Defendants' motion in limine to exclude the expert testimony of Dr. McKinley (Docket No. 43), and **GRANTS** the Defendants' motion for summary judgment (Docket No. 39).  Because the Defendants are entitled to summary judgment, the Plaintiff's motion to exclude aspects of the Defendants' expert witnesses' opinions (Docket No. 40) need not be addressed.  It therefore is **DENIED AS MOOT**.  The court directs the Clerk to enter judgment in favor of the Defendants Centocor and Johnson & Johnson.

ALL OF WHICH IS ENTERED this 30th day of May 2006.

_____

John Daniel Tinder, Judge
United States District Court

_____

(...continued)
the arterial thrombosis.  Without repeating the discussion above, Dr. McKinley's conclusions would have only justified speculation on the part of the jurors as to causation and would not have provided a sound basis for a decision in the Plaintiff's favor.

Copies to:

Elizabeth Anne Ellis
Cory Watson Crowder & Degaris P.C.
bellis@cwcd.com

G. Steven Fleschner
Fleschner Stark Tanoos & Newlin
steve@fleschnerlaw.com

Mary Nold Larimore
Ice Miller LLP
larimore@icemiller.com

Thomas C. Newlin
Fleschner Fleschner Stark Tanoos & Newlin
201 Ohio Street
Terre Haute, IN 47807

Craig P. Niedenthal
Cory Watson Crowder & Degaris P.C.
cniedenthal@cwcd.com

Nancy Menard Riddle
Ice Miller LLP
nancy.riddle@icemiller.com

Leila Hirayama Watson
Cory Watson Crowder & Degaris P.C.
lwatson@cwcd.com

John D. Winter
Patterson Belknap Webb & Tyler LLP
jwinter@pbwt.com